IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| UNITED STATES, | |
| v. | Crim. No. 18-723 (RBK) |
| ALIA AL HUNAITY, | **OPINION** |
| Defendant. | |

**KUGLER**, United States District Judge:

**THIS MATTER** comes before the Court upon Defendant Alia Al Hunaity ("Defendant")'s Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) (the "Motion" or "Mot.") (ECF No. 127). For the reasons set forth below, Defendant's Motion is **GRANTED**.

## I. BACKGROUND

### A. Procedural Background

Defendant is an inmate at Danbury Federal Prison ("FCI Danbury") in Danbury, Connecticut. (ECF No. 127-1 at 2).[1] On May 9, 2019, a jury convicted Defendant of multiple offenses, including marriage fraud in violation of 8 U.S.C. § 1325(c) (Count One); harboring an illegal alien for private financial gain in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii) and

---

[1] All citations to the parties' pleadings, briefs, and exhibits use the page numbers automatically generated by the ECF system. This is of particular relevance to the supplementary docket entries appended to the instant Motion, which group together a constellation of letters, medical records, and other documents into three groups of exhibits (*i.e.*, ECF No. 127-1 for Exs. A–E; ECF No. 127-2 for Exs. F–G; and ECF No. 127-3 for Exs. H–J). Accordingly, rather than citing to this Motion's documents in their individual capacity and deciphering the respective page numbers therein, the Court cites to the ECF-generated page numbers in the larger docket entry pertaining to the relevant exhibit group.

1

1324(a)(1)(B)(i) (Count Two); and forced labor in violation of 18 U.S.C. §1589(a) (Count Three). (ECF No. 75 at 3). This Court sentenced her to imprisonment for a term of sixty months on Count One and terms of seventy months on each of Counts Two and Three, all to be served concurrently. (*Id.*). Defendant was also sentenced to three years of supervised release for each of the three Counts, to be served concurrently upon the completion of her incarceration, and ordered to pay $1,200,208.00 in restitution. *(Id.)*. After this Court granted five postponements of the surrender date,[2] Defendant reported to FCI Danbury on or around October 31, 2021, to begin serving her seventy-month sentence. (ECF No. 129 at 4).

On October 19, 2022, Defendant submitted a formal request for compassionate release to the Warden of FCI Danbury. (ECF No. 127-3 at 17–22). The Warden denied Defendant's request on November 16, 2023. (*Id.* at 23). The Government agrees that Defendant has exhausted her administrative remedies. (ECF No. 129, Gov't Opp'n at 9).

On January 19, 2023, Defendant filed the instant Motion. (ECF No. 127). The Government opposed the Motion on February 24, 2023. (ECF No. 129). The Motion is now ripe for review.

    **B.**    **Factual Background**

        *1.*    <u>*The Offense*</u>

Defendant was convicted of holding a Sri Lankan national ("Victim-1") against her will and forcing her to work as a domestic worker in Defendant's household over a ten-year period.

---

[2] In the months following this Court's imposition of sentence, Defendant filed six applications seeking to extend her surrender date. *See* ECF Nos. 86 (filed June 2, 2020), 92 (filed October 1, 2020), 96 (filed November 12, 2020), 108–09 (filed June 3, 2020, and June 4, 2020, respectively), 113 (filed September 30, 2021), 117 (filed October 21, 2021). The first five applications were granted. (ECF Nos. 88, 94, 99, 112, 116). On October 25, 2021, the Court denied Defendant's sixth application to postpone her surrender date. (ECF No. 120).

(Presentence Investigation Report, or "PSR" ¶¶ 11–25).[3] Victim-1 was not paid for her services, despite a verbal agreement to pay her a salary of $150 per month and a false promise that the money would be held in a bank account for her. (*Id.* ¶ 14).

Prior to her time in the United States, Victim-1 was a domestic worker for Defendant's family in Jordan and came to the United States from Jordan legally on a temporary visa in or around 2009 to care for Defendant's three children. (*Id.* ¶ 13). Defendant did not allow Victim-1 to leave the United States after her visa expired, causing Victim-1 to overstay. (*Id.*). In the ensuing years, Victim-1 was required to serve as an unpaid domestic worker for Defendant's family, which involved caring and cooking for Defendant's three children and cleaning the family's residence. (*Id.* ¶ 15). United States Homeland Security Investigations ("HSI") found that on at least two occasions, Defendant struck Victim-1. (*Id.* ¶ 14). Over the course of her time with Defendant, Victim-1 was generally not permitted to leave the house. (*Id.* ¶ 15). In 2018, Defendant forced Victim-1 into a sham marriage for the purpose of securing Victim-1's legal immigration status in the United States. (*Id.* ¶ 18). Victim-1 maintains that this marriage was a fraud and that there is no romantic relationship between herself and Defendant. (*Id.*).

Defendant's PSR notes that she did not receive an upward adjustment under the U.S. Sentencing Guidelines ("U.S.S.G." or "the Guidelines") for obstructing justice, nor did she receive a downward adjustment for accepting responsibility. (*Id.* ¶¶ 26–39). Defendant was given a three-level enhancement for involuntary servitude lasting for more than one year and a two-level enhancement for a felony committed during the commission of an involuntary servitude offense. (*Id.* ¶ 31–32).

---

[3] Ms. Al Hunaity's PSR is on file with the U.S. Probation Office in the District of New Jersey.

       2.      *Defendant's Health*

Since her incarceration, Defendant was diagnosed with Type 2 diabetes and suffers from high blood pressure. (*See* ECF No. 127-2 at 2–65). She has also been diagnosed with clinical depression and anxiety, primarily due to concern for her son's medical condition. (*Id.*).

       3.      *Heath of Defendant's Minor Child*

Defendant has triplet sons, each of whom is currently around age fifteen. (*See* ECF No. 127-3 at 17) (mentioning one of her "fourteen-year-old" sons in a letter dated October 19, 2022). Significantly, one of Defendant's sons ("Minor Child-1") suffers from cystic fibrosis. (ECF No. 127-1 at 9–24).

To address the myriad daily health complications that Minor Child-1's cystic fibrosis poses, Minor Child-1's caretaker must ensure that he is given oral, topical, and respiratory medication and must also coordinate his gastronomy tube feedings and multiple daily sessions of airway clearance therapy. (*Id.*; PSR ¶ 49). Additionally, the caretaker must carefully and regularly sanitize Minor Child-1's medical equipment, as those with cystic fibrosis are extremely susceptible to infection. (ECF No. 127-3 at 18).

The nature and extent of Minor Child-1's daily pulmonary therapies and medications must be carefully documented by his caregiver so that his medical team can determine any alterations or additions based on their evaluations. (*Id.*). Defendant contends that, prior to her incarceration, she was the sole caregiver capable of working with and instructing school health personnel regarding Minor Child-1's nutritional, medication, and pulmonary clearing needs and of being immediately available in the event of an emergency. (*Id.*).

Defendant alleges that since her incarceration, "both medically and psychologically, [Minor Child-1]'s condition has deteriorated." (ECF No. 127 at 6). On September 29, 2022,

4

Minor Child-1 was admitted to the hospital with two forms of pulmonary bacterial infections for which his physicians inserted a "pick-line" to administer the necessary antibiotics. (*Id.*). Although released from the hospital on October 6, 2022, he continued this regimen of antibiotics until October 14, 2022. (*Id.*).

Defendant also submitted a letter from Minor Child-1 in support of the Motion. (ECF No. 127-1 at 17–18). In it, he describes suffering from a health incident while his father was absent and during which, although his mother gave instructions over the phone, his brother was unable to care for him. (*Id.*). He also alleges that despondency over his mother's incarceration caused him to stop taking his medications, a choice which sent him to the hospital. (*Id.*).

### 4. *Health of Mr. Al-Qatarneh*

Prior to her incarceration, Defendant was the primary caregiver of each of her sons. (ECF No. 127 at 5). Defendant divorced the biological father of the children, Mr. Imad Al-Qatarneh, shortly after her sons' births, and was subsequently made the custodial parent. (*Id.*). Since Defendant's incarceration, Mr. Al-Qatarneh has been the triplets' primary caregiver. (*Id.*).

On March 8, 2023, Mr. Al-Qatarneh suffered a serious heart attack. (ECF No. 130, Letter from Def.'s Counsel). Before the heart attack, he had been admitted to the hospital several times for other surgeries. (*Id.*). Following the heart attack, an aneurysm was discovered on the artery between Mr. Al-Qatarneh's heart and his lungs. (*Id.*). In addition, Mr. Al-Qatarneh has diabetes, is morbidly obese, and smokes heavily. (*Id.*). Although he has been prescribed blood pressure medications to avoid a rupture of the aneurysm, his doctor nevertheless has described him as a "ticking time bomb." (*Id.*). His doctor stated further that if Mr. Al-Qatarneh does not have surgery to remedy the aneurysm soon, he will likely die. (*Id.*). Mr. Al-Qatarneh, however, has delayed scheduling this life-saving surgery because there is currently no one else to care for the

children during the anticipated six-to-eight-week inpatient recovery period and subsequent eight months of recovery at home. (*Id.*). His doctor has recommended "that Mr. Qatarneh limit[] his activities including any burden of caring for others to minimize any symptom exacerbation." (*Id.*).

Minor Child-1's health issues require a caretaker with specialized medical knowledge. (ECF No. 127-1 at 9–10). Mr. Al-Qatarneh's children have attested that Mr. Al-Qatarneh was not a capable caretaker even prior to his heart attack and that there were times when he could not complete his son's treatments due to his own mobility issues and hospital visits. (ECF No. 127-1 at 17–18). Now, as Mr. Al-Qatarneh suffers from an even more threatening condition due to his aneurysm, much of Minor Child-1's daily care is currently being performed by his underage siblings, as Minor Child-1 himself attests. (*Id.*).

Prior to her conviction, Defendant was a medical research professional and continues to communicate with her sons from FCI Danbury, sending care instructions via email. (ECF No. 127-1 at 17–23). The family attests that there is no other relative who can care for the children in the United States. (*Id.*). The rest of Defendant's family still lives in Jordan, and Mr. Al-Qatarneh's current wife has refused to care for the children. (ECF No. 127 at 8). It is unclear whether Mr. Al-Qatarneh's wife lives with him and the minor children at present.

     5.    *The Government's Opposition*

The Government argues that Defendant has failed to meet her burden to show that compassionate release is justified. (ECF No. 129, Gov.'s Opp. at 1). The Government asserts that Defendant's conduct was "incredibly serious," and highlights the fact that Defendant "took significant steps to cover up her criminal activity and shield Victim-1 from detection by law enforcement." (*Id.* at 1–2). Further, the Government asserts that "[i]ncomplete punishment runs

the risk that [Defendant] will commit additional criminal offenses" and that "releasing her would not adequately deter others from perpetrating future, similar crimes." (*Id.* at 19).

Regarding Mr. Al-Qatarneh, the Government argues that he "is neither deceased nor incapacitated—indeed, he has been acting as their caretaker in [Defendant's] absence." (*Id.* at 10). The Government argues further that Defendant's briefings "outline that while the child's father, and current caregiver, may not be perfect, he is providing sufficient care for Minor Child-1" and that he "continues to work and is certainly not incapacitated." (*Id.*). Because of this, the Government asserts that Defendant has failed to demonstrate extraordinary and compelling reasons that would warrant compassionate release. (*Id.* at 16).

The Court points out, however, that the Government filed its opposition brief on February 24, 2023, before Mr. Al-Qatarneh's heart attack altered the conditions underpinning Defendant's Motion. (*See* ECF No. 130, Letter from Def.'s Counsel). The Government did not respond to this development and has not filed any additional briefing in the months since.

## II.     LEGAL STANDARD

The changes implemented by the First Step Act allow prisoners to directly petition the sentencing court for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A). First, however, prisoners must satisfy the administrative exhaustion requirements laid out in the statute. *United States v. Alexander*, Crim. No. 19-32, 2020 WL 2507778, at *2 (D.N.J. May 15, 2020). To exhaust administrative remedies, a defendant must present her request for compassionate release to the warden of her prison. *United States v. Harris*, 973 F.3d 170, 171 (3d Cir. 2020). Thirty days after submitting the request or receiving a denial, whichever is earlier, the defendant may move for compassionate release in the district court. *Id.*

A court may reduce a defendant's term of imprisonment "after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]" 18 U.S.C. § 3582(c)(1)(A). The sentencing factors under 18 U.S.C. § 3553(a) require courts to consider, among other things, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from future crimes by the defendant. *Id.* "Compassionate release is discretionary, not mandatory; therefore, even if a defendant is eligible for it, a district court may deny compassionate release upon determining that a sentence reduction would be inconsistent with the § 3553(a) factors." *United States v. Alexander*, No. 23-1011, 2023 WL 4198042, at *1 (3d Cir. June 27, 2023); *see also United States v. Pawlowski*, 967 F.3d 327, 330 (3d Cir. 2020) (holding that the district court acted within its discretion to deny compassionate release based on the § 3553(a) factors even where the Government did not dispute that extraordinary and compelling reasons were present). The defendant bears the burden of showing that she is entitled to compassionate release. *United States v. McNair*, 481 F. Supp. 3d 362, 365 (D.N.J. 2020).

"Extraordinary and compelling reasons" are not defined by statute. Rather, Congress tasked the U.S. Sentencing Commission (the "Commission") with providing further guidance. Congress's only instruction on this point was that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). The Commission amended the Guidelines effective November 1, 2023. *See United States v. Tobolsky*, Crim. No. 21-303, 2024 WL 323476, at *2 (D.N.J. Jan. 29, 2024). As part of the amended Guidelines, the

Commission updated a policy statement regarding when a reduction in a term of imprisonment may be appropriate under 18 U.S.C. § 3582(c)(1)(A). *See* U.S.S.G. § 1B1.13 (the "Policy Statement"). The Policy Statement states in relevant part:

> (a) In General.—Upon motion of the Director of the Bureau of Prisons or the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that--
> (1)(A) extraordinary and compelling reasons warrant the reduction; . . .
> (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
> (3) The reduction is consistent with this policy statement.

Additionally, the Policy Statement provides that extraordinary and compelling reasons may exist to warrant a sentence reduction upon "[t]he death or incapacitation of the caregiver of the defendant's minor child." U.S.S.G. § 1B1.13(b)(3)(A).

For guidance on what constitutes "incapacitation," courts have looked to Bureau of Prison ("BOP") guidelines for handling inmate compassionate release requests. *United States v. Doolittle*, No. 19-501, 2020 WL 4188160, at *2 (D.N.J. July 21, 2020). For a family member caregiver to be considered incapacitated, he must have suffered a severe injury or currently be suffering from a severe illness that renders him incapable of caring for his children. BOP Program Statement § 5050.50: Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g) (revised January 17, 2019) (hereinafter "BOP Program Statement § 5050.50") at 7–9 (noting that "'incapacitation' means the family member caregiver suffered a severe injury (e.g., auto accident) or suffers from a severe illness (e.g., cancer) that renders the caregiver incapable of caring for the child"). The caregiver cannot merely be inconvenienced by his responsibilities; he must be truly incapacitated. *United States v. Cruz-Rivera*, Crim. No. 11-43, 2020 WL 5993352, at *7 (E.D. Pa. Oct. 9, 2020) ("Many

9

individuals [with serious conditions] are able to go about their daily lives and are not incapacitated."). A "trying" medical condition such as diabetes or certain cancers, although serious, does not require a finding of incapacitation. *Id.*

### III.  DISCUSSION

#### A.  **Extraordinary and Compelling Reasons**

The Court notes Defendant's claims regarding her own health issues but does not rule on them because the circumstances surrounding the deteriorating health of Mr. Al-Qatarneh on their own rise to the level of extraordinary and compelling reasons for a reduction in sentence.

Defendant reports that Mr. Al-Qatarneh has been the sole caretaker for her children during her incarceration and that he is suffering from an illness that is so incapacitating that he can no longer care for their children. (Letter from Def.'s Counsel, Sept. 14, 2023).[4] We therefore begin our analysis of the "extraordinary and compelling" standard by focusing on Mr. Al-Qatarneh's health.

The Government, citing BOP guidance, incorrectly argues that incapacitation in the context of this case requires Mr. Al-Qatarneh to suffer "a severe cognitive deficit" or be "completely disabled, meaning that the spouse or registered partner cannot carry on any self-care and is totally confined to a bed or chair." (Gov't Opp'n at 8; BOP Program Statement § 5050.50 at 9–12). This definition, however, refers to a separate category of extraordinary family circumstance: the incapacitation of a *spouse or registered partner*. *See* BOP Program Statement

---

[4] Defendant's counsel has sent numerous *ex parte* letters to the Court to provide updates on Mr. Al-Qatarneh's health status, pursuant to our Order from August 3, 2023. (ECF No. 131). In the interest of keeping confidential Mr. Al-Qatarneh's medical information, these letters have not been filed on the docket.

§ 5050.50 at 9–12. Mr. Al-Qatarneh is neither Defendant's spouse nor registered partner, and Defendant does not cite incapacitation in this context as a reason for release.

When considering the incapacitation of a *family member caregiver*, by contrast, the BOP Program Statement has another, distinct category. As discussed, family member caregiver incapacitation occurs when there is a severe injury or illness that "renders the caregiver incapable of caring for the child." *Id.* at 7. Further, when reviewing requests for compassionate release, the assessment should include, "based on the information provided, whether release of the inmate to care for the inmate's child is in the best interest of the child." *Id.*

In this instance, not only has Mr. Al-Qatarneh suffered a heart attack, but he also has several ongoing medical issues, including an aneurysm that could burst at any moment. (Letter and Medical Records from Def.'s Counsel, Dec. 12, 2023). Even if the standard used by the Government in its response were appropriate, Mr. Al-Qatarneh requires life-saving surgery that, if successful, will confine him to the hospital for an extended period, thereby rendering him completely bedridden. (*Id.*). The subsequent out-of-hospital recovery will take several months, and his doctor has recommended that he cease his caregiving responsibilities. (*Id.*). Put simply, even if the Court were to follow the BOP standard for spousal incapacitation, Mr. Al-Qatarneh would no doubt meet this standard for an extended period if he were to pursue the much-needed surgery to address his aneurysm.[5]

---

[5] Other courts in this district have also used BOP's spousal incapacitation standard to grant early release. *See*, *e.g.*, *United States v. Walker*, Crim. No. 19-928, 2024 WL 580152, at *3 (D.N.J. Feb. 13, 2024). However, given that Mr. Al-Qatarneh is no longer Defendant's spouse and is more accurately characterized as a "family member caregiver," we find it more appropriate to adhere to the BOP's family member caregiver incapacitation standard in this case.

The Court has received extensive medical documentation for both Mr. Al-Qatarneh and Minor Child-1. In addition to detailing Minor Child-1's various medical conditions, Defendant has provided the Court with the relevant medical records concerning Mr. Al-Qatarneh's recent heart attack, including letters from his doctor and a partial medical history prior to this incident. (*See generally, e.g.*, ECF No. 127-1; ECF No. 127-2; Letter from Def.'s Counsel, Sept. 14, 2023; Letter and Medical Records from Def.'s Counsel, Dec. 12, 2023); *cf. United States v. Mason*, Crim No. 17-191, 2021 WL 2530781, at *3–4 (D.N.J. June 17, 2021) (denying compassionate release on the basis that a single letter confirming treatment in the ICU is insufficient evidence of incapacitation). Defendant has also made vividly clear to the Court the extent of the daily care and emergency availability required to adequately tend to Minor Child-1's health needs. (*See, e.g.*, ECF No. 127-3 at 17–19).

Other courts in this district have recently held that an individual who is incapable of providing adequate support for themselves should be disqualified from being considered a family member caregiver. *See, e.g.*, *Walker*, 2024 WL 580152, at *4 (a defendant's twenty-year-old daughter with her own support needs was not considered as a caregiver to her epileptic and diabetic sibling). Courts outside of this district have also granted release where a defendant's children are in dire need of the defendant's care and the family member caregiver is unable to continue providing that care. *See, e.g.*, *United States v. Seals*, 509 F. Supp. 3d 259, 263 (E.D. Pa. 2020) (granting release where the family caregiver had stage-4 pancreatic cancer that rendered her physically unable to care for her granddaughter); *United States v. Kesoyan*, Crim. No. 15-236, 2020 WL 2039028, at *6 (E.D. Ca. Apr. 28, 2020) (granting release where family members became incapacitated by sickness and substance abuse and could no longer care for disabled adult son); *United States v. England*, Crim. No. 18-61, 2020 WL 4004477, at *3 (D. Mont. July

12

15, 2020) (granting release where grandparents could no longer financially or physically support their sick infant granddaughter); *United States v. Kataev*, Crim. No. 16-763-05, 2020 WL 1862685, at *3 (S.D.N.Y. Apr. 14, 2020) (granting release where child had cerebral palsy and leukemia and child's mother was unable to provide care due to the pandemic). As such, given the exceptional nature of Minor Child-1's condition and Mr. Al-Qatarneh's own rapidly deteriorating health, the Court finds that Defendant has provided sufficient evidence demonstrating Mr. Al-Qatarneh's incapacity to care for Minor Child-1.

In addition to proving her former husband's incapacitation, however, Defendant must also show that Mr. Al-Qatarneh is currently the sole available caregiver for her minor children. *United States v. Jones*, No. 14-463, 2021 WL 3732877, at *2 (D.N.J. Aug. 24, 2021) ("[W]hen evaluating whether a caregiver is incapacitated, 'adequate information and documentation should be provided including . . . a statement and letters of documentation that the inmate is the only family member capable of caring for the [minor child] . . . .'").

Candidates for family member caregivers beyond Mr. Al-Qatarneh have proven elusive. Defendant's extended family lives in Jordan and those relatives not been able to enter the United States. (ECF NO. 127-1 at 15). Mr. Al-Qatarneh's wife, who at one point shared a residence with Mr. Al-Qatarneh, has explicitly refused to care for the children, and Defendant has stated that she has cause to believe that they may be seeking a separation. (ECF No. 127 at 8). As a result, the brunt of the day-to-day caregiving has currently fallen to Mr. Al-Qatarneh and, to a troubling extent, Defendant's other minor children. (*Id.* at 7; ECF No. 127-1 at 17–18). None of these individuals are sufficient caregivers under the circumstances.

Accordingly, the Court finds that Mr. Al-Qatarneh's rapidly deteriorating health and the exceptional care needs of Minor Child-1 constitute extraordinary and compelling reasons that

justify granting Defendant's release. *See* U.S.S.G. § 1B1.13(b)(3). Further, based on the information and documentation provided, the Court finds Defendant's release to care for Minor Child-1 to be in the best interest of the child. *See* BOP Program Statement § 5050.50 at 7.[6]

### B. Section 3553(a) Factors

Notwithstanding a finding of extraordinary and compelling reasons meriting release, a court must look to the factors contained in 18 U.S.C. § 3553(a) when considering a reduction to a defendant's sentence. *Walker*, 2024 WL 580152, at *4. These factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B) to afford adequate deterrence to criminal conduct;
> > (C) to protect the public from further crimes of the defendant; and
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a).

The Government argues that granting the Motion would not reflect the seriousness of Defendant's crime and would have a negative impact on general deterrence. Specifically, it states that granting Defendant early release would undermine both "the deterrence that imposition of the sentence originally envisioned" and "the severity of the Defendant's crimes and the nature of the circumstances that impelled this Court to impose an aggregate 70-month sentence." (ECF No. 129 at 20).

---

[6] In a letter sent to the Court, Minor Child-1 recognized that his father is not capable of providing him with adequate care: "My dad is a great dad and I couldn't ask for a better dad. But with his health he can't do better. He needs someone to take care of him." (ECF No. 127-1 at 18).

The Court does not deny the very serious nature of Defendant's crimes. The Court recognizes, however, that Defendant has served nearly half of her sentence, has no prior criminal history, and has given no indication that she would reoffend or repeat the behavior giving rise to the unique nature and circumstances of this case. Moreover, our granting of early release does not undermine our imposition of a 70-month sentence because others convicted of similar crimes in the future will not plausibly believe they can replicate the exceptional circumstances surrounding Defendant's family and Minor Child-1's health care needs.

Additionally, the victim of Defendant's crimes expressed misgivings about Defendant's incarceration prior to her sentencing. In her victim impact statement to U.S. Probation Services, Victim-1 appeared more concerned with the well-being of Defendant's children than with making an example of her abuser, stating: "I do not want Alia to go to jail because of the children, even if she did not treat me right." (PSR, Victim Impact Statement at ¶¶ 22–23) (noting further that Victim-1 was "worried of the defendant's three children, whom she became close to"). These statements indicate Victim-1's own discomfort with Defendant's prolonged period of incarceration in light of the circumstances surrounding Minor Child-1 and his siblings. Although the Court emphasizes the severity of Defendant's crimes and Defendant's heinous treatment of Victim-1, Victim-1's statement expressing concern for Defendant's children is newly salient given the facts underpinning this Motion. Her statement supports the Court's finding that reducing Defendant's sentence would not undermine respect for the law or just punishment for Defendant's offense and would appropriately balance the seriousness and nature of the offense with Defendants' specific circumstances.

In sum, after considering the §3553 factors, the Court finds that the chronic lack of a family member caregiver with the capacity to address Minor Child-1's exceptional care needs weigh in favor of a reduction of Defendant's sentence.

### C. Danger to the Community

Finally, the Court must decide whether Defendant is a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13(a)(2). Rehabilitation, by itself, cannot be considered an extraordinary and compelling reason for release. 28 U.S.C. § 994(t); *see also* 18 U.S.S.G. § 1B1.13(d). "But for practical purposes, in determining whether a defendant poses a danger, their progress toward rehabilitation is an important consideration." *Seals*, 509 F. Supp. 3d at 263.

The Court looks first to Defendant's conduct while incarcerated. Over the course of her incarceration, Defendant has made a significant effort towards her own rehabilitation, including completing numerous state-run programs in the BOP. (ECF No. 127-3 at 2–15). The Court notes Defendant's progress in these programs only for purposes of its assessment of Defendant's potential danger to the community, not as an independent reason meriting early release.

For the same reasons as those the Court considered in its analysis of the § 3553(a) factors, the Court does not believe that Defendant poses a danger to any other person or the community. The Court bases this judgment on the unique nature and circumstances of the crimes, Defendant's lack of prior criminal history, Victim-1's own testimony regarding the Defendant and her children, and the exceptional care needs of Minor Child-1.

### IV. CONCLUSION

For these reasons, Defendant's Motion (ECF No. 127) is **GRANTED**. Defendant's sentence is hereby reduced to time served, and the conditions of supervised release are hereby

16

modified to a term of **five years**, the first two years of which shall consist of home confinement. *See* § 3582(c)(1)(A) (stating that the sentencing court "may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment"). Defendant shall also act as the primary caregiver for Minor Child-1 and his siblings until they reach the age of majority. *Id.* An Order follows.

Dated:  March 7, 2024                           /s/ Robert B. Kugler
                                                            ROBERT B. KUGLER
                                                            United States District Judge